**People of the State of Illinois, Plaintiff-Appellee, v. Abbas Sadeghzaden, Defendant-Appellant.**

**Gen. No. 53,795.**

First District, Second Division.

May 19, 1970.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Herbert Becker, Norman W. Fishman, and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

Edward V. Hanrahan, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Michael Scott Cisney, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE LYONS delivered the opinion of the court.

In a trial by the court without a jury the defendant, Abbas Sadeghzaden, was found guilty of aggravated battery (Ill Rev Stats (1967), c 38, § 12–4(a)). Judgment was entered and after his oral motions for a new trial and in arrest of judgment were denied, the defendant was

sentenced to seven to ten years in the State Penitentiary. In this appeal he seeks a new trial urging that: (1) he did not knowingly and understandingly waive his right to a jury trial; and (2) the trial court erred in not ordering, on its own motion, a competency hearing during the trial. Since the defendant does not question the sufficiency of the evidence, the facts will be briefly stated.

Testifying for the State were the complaining witness, Marilyn Pavlik Anagnos, and two police officers, Sergeant Leonard Stahl and Detective Mike Ricci. The defendant was the sole witness for the defense.

Mrs. Anagnos, who was unmarried at the time of the alleged offense but married at time of trial, stated that on April 1, 1968, she had known the defendant for over two years during which time they had dated periodically; that on April 1, 1968, the defendant met her after work, they had dinner together and afterwards he persuaded her to go with him to his apartment as he had a suitcase he wanted to give to her. The complaining witness and the defendant were thereafter alone in his seventh-floor apartment. He removed some stock certificates from his suitcase and told the complaining witness to endorse them to herself which she did. After returning from the kitchen with a glass of water for the defendant, she noticed that he had a small gun in his hand which he was pointing at the floor. The defendant then told her he was going to kill himself because in two days he was to be deported to Iran.

Continuing, the complaining witness testified that she attempted to persuade the defendant not to commit suicide and offered to drive him around that night and discuss the problem with him, but her efforts to leave the apartment were unsuccessful. She became frightened and went into the bathroom to see if there was anything there which she could use to protect herself but found nothing. When she returned to the defendant and sat on

the couch, he told her that if she was frightened, she should take some of his pills. When she asked what would happen if she refused, the defendant said he would have to shoot her. After this conversation, the complaining witness went again to the bathroom and, after closing the door, put her back against it and braced her feet against the radiator located on the wall opposite the door in an attempt to prevent the defendant's entry into the bathroom.

After a very short time, the defendant broke in and shot the complaining witness. She testified that the bullet passed through her arm, shattered her skull, and lodged in her head. The defendant threatened to shoot her again, but she was able to leave the locked apartment and, while screaming, ran down the seven flights of stairs to the first floor, where a tenant brought her into his apartment and called the police, who thereafter took her to the emergency room of Edgewater Hospital where the bleeding was stopped. She remained in the hospital for two weeks, during which time she was operated on and the bullet was removed from her head. As a result of the shooting, her coordination is poor in her left arm, she has a hole in her head, and she is taking medication since there is a possibility that she could go into convulsions. She identified People's Exhibit 1, a gun, as looking like the same type weapon she saw in defendant's hand on April 1, 1968. The shooting occurred sometime after 9:30 p. m. on that date.

Sergeant Stahl testified that on April 2, 1968, at approximately 3:20 a. m., he was on duty as a desk sergeant when the defendant came into the police station; that the defendant had a small gun, resembling an automatic, pointed at the defendant's right temple, and said that he was going to shoot himself but wanted to talk to somebody; that the accused went into an empty office at Stahl's request and for the next seven hours, various

378

policemen, clergymen, and newspapermen tried to persuade the defendant to surrender his weapon. Finally, he did so without firing any shots. Sergeant Stahl identified People's Exhibit 1, a gun, as resembling the weapon the defendant held to his temple for seven hours in the police station on April 2, 1968.

Detective Ricci corroborated much of Sergeant Stahl's testimony, also identified People's Exhibit 1, and testified that in a conversation with the defendant at the police station, the accused admitted shooting his girl friend earlier in the evening and stated that he did so because he could not stand to leave her behind when he was deported. Now he wanted to take his own life. At the close of the State's case, the weapon was admitted into evidence without objection and it was stipulated that the defendant was forty years of age.

The defendant testified and contended that the shooting was accidental. He stated that for three years prior to the alleged offense, he had been employed by one company, was head of its shipping department, and had lived in the United States for sixteen or seventeen years; that prior to 5:00 p. m. on April 1, 1968, the complaining witness called him at work and they made a date to have dinner together that evening; that later he and Miss Pavlik went to his apartment, where he put his gun against his temple and told her he would rather be dead than be deported; and that the gun accidentally discharged when she grabbed for it. Continuing, the defendant stated that he was holding the weapon when it went off, and the bullet went through his left arm. He then noticed that Miss Pavlik's face was bleeding. They left the apartment together, asked a neighbor to call an ambulance, and while Miss Pavlik was apparently waiting for the ambulance, the defendant went to the police station to report the incident, but first stopped at a tavern and had some drinks. He went to the police station later

and wanted to commit suicide there, but was persuaded to surrender his weapon. The defendant denied shooting the complaining witness and stated that she could have been shot by the bullet passing through his arm, ricocheting off the wall or floor, and thereafter hitting her. In rebuttal, the State introduced authenticated documentary evidence showing that in 1956 the defendant had been convicted of murder in Cook County.

Regarding the jury waiver issue, the record reflects the following colloquy between the court, the defendant, and the defendant's appointed counsel:

Defense counsel: ". . . Mr. Sadeghzaden and I discussed the situation as to a bench or jury trial. I think we agreed he desired a bench trial, is that right sir?"

Defendant: "Yes sir."

Court: "Do you understand, Mr. Sadeghzaden, by doing that you automatically waive your right to a jury trial?"

Defendant: "I certainly do, your honor."

Court: "You wish to be tried then by myself without a jury?"

Defendant: "Yes, your honor."

Court: "Will you please indicate that by signing a jury waiver."

(The common-law record contains the jury waiver signed by defendant.)

The Illinois Legislature—in the Code of Criminal Procedure—has codified the constitutional right (Art II, § 9) to a jury trial guaranteed to defendants in criminal trials and the conditions under which such a personal privilege can be waived. The controlling statute (Ill Rev Stats (1967), c 38, § 103–6) provides:

"Every person accused of an offense shall have the right to a trial by jury unless understandingly waived by defendant in open court."

██ The duty is imposed upon the trial court to see that such a waiver is expressly and understandingly made, which judicial responsibility is not to be perfunctorily discharged. People v. Fisher, 340 Ill 250, 265, 172 NE 722, 728 (1930). However, there is no specific or defined formula which the trial court is to follow or from which to judge whether a waiver is understandingly made but rather such a determination must rest upon the facts of each particular case. People v. Wesley, 30 Ill2d 131, 133, 195 NE2d 708, 710 (1964).

In the case at bar, the defendant agreed with his counsel, in open court, that he wished to be tried by the court. The trial court thereafter spoke directly to the accused explaining to him that he would thereby waive his right to a jury trial and receiving from the defendant a direct, unequivocal request that he wanted to be tried by the court without a jury. The defendant executed a written jury waiver form. On appeal, defense counsel urges that the trial court was too brief with the accused and should have given him a detailed and meticulous explanation of exactly what a jury trial encompassed in recognition of the fact that the defendant is an alien.

██ Within the facts of this case, we are not persuaded by such an argument. The record shows that the defendant, a man of the age of forty, had been in this country for sixteen or seventeen years at time of trial, was no stranger to criminal proceedings as shown by his conviction for murder twelve years before the instant prosecution, and held a responsible position as head of the shipping department for his employer. The defendant did nothing to alert the trial court to the possibility that a more detailed explanation of a jury trial was re-

quired. Indeed, the record reflects that the responses of the accused to the court regarding waiver of a jury trial were unhesitating, direct, and unequivocal. There is nothing in this record indicating that the defendant did not understand the words "waiver" and "jury" as they are commonly understood. People v. Spencer, 115 Ill App2d 398, 253 NE2d 672 (1969). His desire for a nonjury trial was clear and unmistakable. At no time was he confused or ignorant of his right to a jury trial. We hold that the circumstances surrounding the jury waiver in the case at bar amply demonstrate that it was knowingly made by the defendant. People v. Piesen, 115 Ill App2d 373, 253 NE2d 16 (1969) ; People v. Collins, 112 Ill App2d 458, 251 NE2d 325 (1969).

■ Regarding the incompetency issue, counsel for the defendant asserts that a bona fide doubt of the defendant's lack of competency was demonstrated at the trial by the evidence of his irrational behavior in shooting the complaining witness and his subsequent conduct at the police station. He contends that although neither the defendant nor his trial counsel requested a competency hearing, the trial court erred in failing to direct one on its own motion when this evidence was presented. We do not agree. Such a contention, as presented in the instant case, would require this court to equate automatically the affirmative defense of insanity which must exist at the time of the offense with the lack of competency to stand trial at some subsequent point in time—seven months in the case at bar. The two issues of insanity and incompetency, distinct concepts in the law, are not to be regarded as synonymous. Any deficiency in the mental condition of the defendant at the time of the alleged offense does not automatically mean that he is not competent to stand trial at a later point in time. In this regard we note that the defense presented by the accused in the trial court

was not one of insanity but rather that the shooting was accidental and not intentional.

After the defendant's arraignment and on motion of his counsel, the trial court ordered the Behavior Clinic of the Circuit Court of Cook County, Criminal Division, to examine the accused on the question of his competency. The record contains a written report of the psychiatric examination of Dr. Haines, Director of the Clinic, filed three months after the offense and four months before the trial, in which Dr. Haines states that the defendant "has a good command of the English language, is able to express himself, and has never been in a mental institution but has been in a psychiatric department of another institution for observation." It was the diagnosis of Dr. Haines that the defendant suffered from reactive depression but knew the nature of the charge and was able to cooperate with his counsel.

██ ██ When the case went to trial four months later and apparently after the defendant and defense counsel had read this written report, neither the defendant nor his counsel requested a competency hearing. The accused testified in his own behalf and, in effect, cooperated with his counsel and showed that he understood the nature of the charge against him by attempting to persuade the trial court that the shooting was accidental and not intentional. His testimony was straightforward, clear, coherent, and rational. Although the written report indicated that the defendant had been in a psychiatric department of some nonmental institution for observation, this alone did not raise a bona fide doubt of his incompetency so that the trial court was duty bound to conduct a competency hearing when neither the defendant nor his counsel sought one and the conduct of the accused at his trial indicated he was rational and cooperative. People v. Richeson, 24 Ill2d 182, 181 NE2d 170 (1962). Since the record fails to support a bona fide doubt of the de-

383

fendant's alleged lack of competency to stand trial, the trial court did not err in failing to conduct a competency hearing on its own motion. People v. Tackett, 115 Ill App2d 439, 253 NE2d 658 (1969).

The judgment is affirmed.

Judgment affirmed.

McCORMICK, P. J. and BURKE, J., concur.